UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GUO WENGUI, BEIJING PANGU INVESTMENT CO., LTD., and BEIJING ZENITH HOLDINGS CO. LTD.<br><br>           Plaintiffs,<br><br>     v.<br><br>ZHENG WU A/K/A BRUNO WU,<br><br>           Defendant. | Civil Action No. _____-CV-_____<br><br>**COMPLAINT** |

Plaintiffs Guo Wengui ("Guo"), Beijing Pangu Investment Co., Ltd. ("Pangu"), and Beijing Zenith Holdings Co. Ltd. ("Zenith," together with Pangu, the "Plaintiff Companies") (collectively, "Plaintiffs") for their complaint and action for money damages against defendant Zheng Wu a/k/a Bruno Wu ("Wu"), allege as follows:

## PARTIES

1.      Plaintiff Guo is a Hong Kong citizen who presently resides in New York.  He left China at the end of 2014.  He has been a longstanding critic of corruption within elements of the Chinese government and a leading advocate for government reform.

2.      Plaintiff Pangu is organized under the laws of China and has a principal place of business at 27 Central North 4th Ring Drive, Chaoyang District, Beijing 100101, China.

3.      Plaintiff Zenith is also organized under the laws of China and has a principal place of business at 317 Datunlu, Chaoyang District, Beijing 100101, China.

4.      On information and belief, Defendant Wu is a United States citizen, who resides in New City, New York.

## JURISDICTION AND VENUE

5.      The Court has personal jurisdiction because Defendant Wu resides in New York and regularly communicated with Plaintiff Guo from within New York regarding the subject matter that forms the basis for this Complaint.

6.      The Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332 because Plaintiff Guo is a foreign citizen, the Plaintiff Companies are organized under the laws of a foreign state, and Defendant Wu is a citizen of a U.S. state.

7.       Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claim occurred in this district.

## FACTS

### A. **Plaintiff Guo's Background**

8.       Plaintiff Guo grew up in a poor household in Northeast China, where his parents had been exiled by the Chinese Communist Party during the Cultural Revolution.  Plaintiff Guo and his family lived in very difficult and harsh conditions, and his parents regularly struggled to provide food and shelter for their eight children.

9.       Growing up under these circumstances forced him to become entrepreneurial at a very young age. When he was 13 years old, Plaintiff Guo dropped out of middle school and started selling clothing and electronics to make money for his family.

10.      Watching his parents struggle while living in exile also instilled in Plaintiff Guo a passion for democracy and the rule of law.  He often used his earnings to help other poor families and to support those advocating for government reform.  During the Tiananmen Square protests in 1989, he sold his motorbike and donated approximately RMB 3,600 ($500) to student protestors, which was a large sum at the time.  This led to his arrest on May 26, 1989, and subsequent imprisonment from 1989 to 1991.

11.     On the day of his arrest, two police officers raided Plaintiff Guo's office and began shooting at his young wife and his three-month old daughter.  When Plaintiff Guo's younger brother attempted to intervene, an altercation ensued and Plaintiff Guo's brother was shot in the process. Even though Plaintiff Guo's brother was rushed to the hospital, the police instructed the doctors not to treat him, causing him to die from blood loss.

12.     While in prison, Plaintiff Guo met many other political activists. This, along with the death of his brother, further strengthened his resolve to fight oppression and corruption.

13.      Plaintiff Guo knew that in order to be an effective voice for government reform, he first had to become successful and influential himself.  As a result, upon his release from prison, he began to get involved in the real estate business.

14.      In 1991, Plaintiff Guo and his family developed the Henan Yuda, a high-end commercial complex worth more than $300 million.  The complex included one of the five tallest buildings in China. The complex was developed exclusively through privately-owned land, and not using any land owned by the government.

15.     Eight years later, in 1998, Plaintiff Guo and his family built Beijing Pangu Plaza and Jinquan Plaza, which together cover an area that is equal to approximately 2 million square meters.  These projects were developed exclusively through privately-owned land, and not using any land owned by the government.

16.     Beijing Pangu Plaza was designed by noted Taiwanese architect C.Y. Lee, and to date is the only privately-owned commercial complex in the Beijing Olympic area.  The complex is owned by Plaintiff Pangu, and consists of five different towers.  The tallest tower is an office building and the smallest tower is a hotel.  The remaining three towers are mixed-use buildings.

17.     In 2002, Plaintiff Guo and his family set up Plaintiff Zenith, a real estate development and investment management consulting company, which owns various developments in the Chaoyang District in Beijing.

18.     After his success in the real estate business, Plaintiff Guo began investing in various businesses.  This included an investment in Founder Securities Co. Ltd. ("Founder Securities"), a company established by Peking University.

**B.  Plaintiff Guo's Whistleblowing Activities**

19.     In 2014, Plaintiff Guo discovered that You Li ("Li"), the CEO and former director of the Founder Group, the parent company of Founder Securities, had embezzled billions of yuan from the Founder Group's investors, including from Plaintiff Guo.

20.     Plaintiff Guo took various steps to expose Li's actions, including sending letters to government officials, and submitting accounts about Li's fraud to the Central Commission for Discipline Inspection ("CCDI") through the CCDI's online reporting system. The CCDI is the agency tasked with investigating fraud and corruption within the Communist Party in China.

21.     Unbeknownst to Plaintiff Guo, Li was part of a corrupt enterprise, which was headed by a former high-ranking officer of the Central Political and Legal Affairs Commission of the Communist Party of China ("OFFICIAL A").

22.     Angered by Plaintiff Guo's whistleblowing, OFFICIAL A, Li, and their corrupt associates used various means to try to intimidate and silence Plaintiff Guo in an effort to hide their corrupt activities.  Among other things, Official A and Li used one of their corrupt associates to commence a government investigation against Plaintiff Guo, and to target Plaintiff Guo, his family and businesses with intimidation tactics, including surveillance, arrests and seizures.

23.     When Plaintiff Guo found out that Li was attempting to silence him, he decided that it would be best if he left China.  Eventually, Plaintiff Guo came to the United States on January 9, 2015.   He has resided in New York since that time.

24.     Since coming to the United States, Plaintiff Guo has continued to expose the corrupt activities of various Chinese businesses and individuals, including some individuals who have held very senior government positions.  For example, in early 2017, Plaintiff Guo exposed widespread allegations of corruption involving the Hainan Group ("HNA"), one of China's largest conglomerates. Among other things, the allegations Plaintiff Guo exposed included that HNA was being used as a vehicle for the corrupt activities of a former high-ranking officer of the CCDI ("OFFICIAL B").  OFFICIAL B worked for the CCDI between 2012 and 2017.

25.     Plaintiff Guo's whistleblowing activities have garnered significant attention and support from around the world.  He currently has over 596,000 Twitter followers, 169,366 YouTube subscribers and 22,500 Instagram followers.  In May 2017, Plaintiff Guo's Twitter account had more than 3.8 billion impressions.  He has also been interviewed by many leading newspapers worldwide, including the New York Times, Wall Street Journal, and other international publications.

26.     At the same time, being a vocal opponent of corruption has made him a high-profile target for corrupt individuals hoping to maintain the status quo and their personal corrupt empire and ill-gotten wealth.  Speaking out against corrupt business leaders and government officials has come with a great amount of risk to his own safety and well-being, along with that of his family members, many of whom are still in China.

C. **China's Anti-Corruption Campaign**

27.     Two years before Plaintiff Guo came to the United States, the Chinese government, led by China's President Xi Jinping, began an extensive campaign aimed at eradicating corruption from every industry in China.

28.     To date, the Chinese government's anti-corruption effort has led to the investigation and punishment of many current and former government officials.  The investigation has also reached various state-owned and private businesses.

29.     In October 2017, President Xi reiterated his commitment to combating corruption at the 19th National Congress of the Communist Party, and the Deputy Chief of the Communist Party has said that authorities will continue to clamp down on corrupt officials through tight supervision and tough penalties.  The CCDI has also warned that officials will continue to be tried and sentenced regardless of their level of seniority.

30.     In November 2017, the Chinese government released draft legislation outlining the powers and functions of a new anti-corruption agency. The new agency will have oversight over China's entire public sector, which employs 62 million people, and will have powers more expansive than those of the CCDI.

D. **Corrupt Officials Acting Outside the Scope of Their Authority Conspire to Silence Whistleblowers Who Expose Their Activities**

31.     Notwithstanding the efforts of the Chinese government to reform and eliminate corruption, there remain both officials within the government acting outside the scope of their authority and private individuals outside of the government who continue to engage in corrupt activities in order to advance their own personal and business interests.

32.     These corrupt officials and private individuals set their own agenda outside of the scope of the official Chinese government and, in fact, act for their own personal benefit and

contrary to the stated policies and direction of the official Chinese government.  They use their power both inside and outside the government to benefit personally, and to attempt to threaten and silence anyone who speaks out against their activities.

33.     This is the conspiracy.  In particular, a group of individuals, both outside and inside the Chinese government conspired with each other and worked in concert to protect their personal interests and silence Plaintiff Guo.  At the center of the conspiracy was OFFICIAL A, who worked together with Li of the Founder Group, Defendant Wu, OFFICIAL B and others.  As set forth more fully below, Defendant Wu was integral to the conspiracy, playing a substantial role in efforts to intimidate, silence and discredit Plaintiff Guo and others who attempted to disclose the corrupt activities of the conspirators.

34.     On information and belief, OFFICIAL A and OFFICIAL B and their family members secretly controlled stakes in private Chinese corporations, and used their government positions to direct business and funnel kickbacks to these corporations.  They did so outside the scope of their governmental authority.  Together, and acting in concert with Li, Defendant Wu and others, they have conspired to silence anyone with information that might expose their corrupt behavior.  OFFICIAL A and OFFICIAL B have also used their senior positions within the government to cause official government institutions to act on their behalf, giving their actions an appearance of legitimacy.  These activities are contrary to the Chinese government's stated position of ending government corruption and in furtherance of protecting these individuals' personal agendas.

E.  **Defendant Wu Threatens and Extorts Plaintiff Guo in Furtherance of the Conspiracy**

35.     On information and belief, Defendant Wu is the co-Chairman and CEO of Sun Seven Stars Entertainment & Media Group Limited and the former Chairman of Sun Media

Group in China.  On information and belief, he moved to the United States to advance his own personal financial interests.  While here, he has advanced those interests, and those of his co-conspirators, by threatening those who speak out against, and threaten to expose, the corruption of OFFICIAL A, OFFICIAL B, Defendant Wu and their other co-conspirators.

36.     Plaintiff Guo was introduced to Defendant Wu for the first time in or around December 2014 by an associate of OFFICIAL A.  At the time, Plaintiff Guo was working to defend himself against the threats directed at him by Li and those working with him.  The associate of OFFICIAL A told Plaintiff Guo that Defendant Wu could help him.  Plaintiff Guo trusted OFFICIAL A and had no reason to believe that OFFICIAL A and his associates were part of any conspiracy.  As a result, Plaintiff Guo began communicating with Defendant Wu.

37.     Defendant Wu first contacted Plaintiff Guo via the online chat platform Wechat.  Subsequently, Defendant Wu continued to communicate with Plaintiff Guo by both message and telephone.  Plaintiff Guo received substantially all of these communications in New York.  On information and belief, Defendant Wu also made the communications from New York.

38.     Defendant Wu initially interacted with Plaintiff Guo under the guise of helping him, but, on information and belief, he appeared friendly at first in an attempt to mislead Plaintiff Guo and to gain Plaintiff Guo's trust.

39.     During their first conversation, Plaintiff Guo asked Defendant Wu to help his family and the employees of the Plaintiff Companies in China who had been harassed and threatened with arrest in China.

40.     On or around December 16, 2014, Defendant Wu contacted Plaintiff Guo regarding an article posted on an overseas website, Boxun.com.  The article concerned political favors that Plaintiff Guo allegedly received from a former Chinese government official.  This

article was just one of many false articles posted by Boxun regarding Plaintiff Guo. Defendant Wu claimed that he had connections with Boxun and that he could act on Plaintiff Guo's behalf to persuade Boxun to delete the articles. Defendant Wu then proposed to serve as a "middle man" to convey a monetary offer from Plaintiff Guo to Boxun to delete the articles. On information and belief, Defendant Wu intended to take a portion of any amount paid by Plaintiff Guo in the form of a kickback. Plaintiff Guo refused to succumb to this extortion and would not pay. These articles damaged Plaintiff Guo's reputation by spreading false and misleading claims, and were part of a pattern of retaliation by corrupt officials aimed at whistleblowers such as Plaintiff Guo.

41. Soon after these initial communications, the tone of Defendant Wu's communications with Plaintiff Guo began to change. In particular, Defendant Wu demanded that Plaintiff Guo provide assistance to Defendant Wu and his co-conspirators. Defendant Wu promised Plaintiff Guo protection from what Defendant Wu claimed was "the Chinese government" if Plaintiff Guo acceded to Defendant Wu's demands.

42. For example, in or around late December 2014, Defendant Wu demanded that Plaintiff Guo help him locate an individual in the United States wanted by Defendant Wu and his co-conspirators. They believed that this individual had evidence that would expose corruption by Defendant Wu and his co-conspirators, and they wanted Plaintiff Guo's help in locating the evidence and destroying it. Defendant Wu told Plaintiff Guo that he was "representing all of the people who are behind me. My brothers and my boss salute you." On information and belief, Defendant Wu's reference to "my brothers and my boss" was a reference to his co-conspirators, including OFFICIAL A and OFFICIAL B. At this point, Plaintiff Guo realized that Defendant

Wu was not attempting to help him, but was instead using Plaintiff Guo to advance the interests of Defendant Wu and his co-conspirators.

43.     Defendant Wu continued to pressure Plaintiff Guo to provide assistance in early January 2015, telling him "you must watch those who fly here, don't let anyone out of your sight, especially the target." Defendant Wu further told Plaintiff Guo that he was in New York working with the "New York Unit," and that Plaintiff Guo's "job is done when you give us the information." He also demanded money from Plaintiff Guo.

44.     Throughout this time, Plaintiff Guo made clear to Defendant Wu that he did not want to provide assistance and that he was doing so under duress. Defendant Wu nonetheless demanded that Plaintiff Guo continue with the mission. In doing so, Defendant Wu made clear that he was "in charge of this matter." Whenever Plaintiff Guo expressed reservations, Defendant Wu reminded him that he could only assure Plaintiff Guo's safety if he continued to cooperate. For example, on or around January 1, 2015, Defendant Wu told Plaintiff Guo in essence that, "once you finish the business you could leave freely. There will be no restriction and you have free access."

45.     Defendant Wu also demanded that Plaintiff Guo return to China and assured him that he would be safe if he did what Defendant Wu and his co-conspirators wanted. In a January 7, 2015 telephone conversation, Defendant Wu told him "[t]he Special Investigation team will come to you. After that, you can walk away a free man. You can leave immediately … Be assured! … I can tell you, bound by my honesty, nothing will happen to you." On information and belief, Defendant Wu and his co-conspirators controlled the Special Investigation Team and were able to use it to further their personal agenda.

46.     Defendant Wu likewise suggested that the safety of Plaintiff Guo's family in China depended on Plaintiff Guo's continued cooperation.  On or around January 8, 2015, Defendant Wu threatened Plaintiff Guo, stating that "[a]s long as you follow my instructions, you will be fine and your family will be fine….As long as you explain the few things when you're back, you'll be free to come and go and your safety will be guaranteed.  Join my team.  I guarantee your definite safety."  Plaintiff Guo understood that if he did not accede to Defendant Wu's demands that Defendant Wu and his co-conspirators would cause harm to Defendant Wu's family and business interests in China.

47.     Within days of Defendant Wu making the above threats regarding Plaintiff Guo's family, several of Plaintiff Guo's family members and employees of the Plaintiff Companies were in fact arrested and jailed.  This included Plaintiff Guo's wife and daughter, two of his older brothers and his sister-in-law.  In total, approximately 27 employees of the Plaintiff Companies were arrested from January-to-May 2015.  Plaintiff Guo's elderly parents were also threatened with arrest.  On information and belief, Defendant Wu and his co-conspirators orchestrated these arrests in order to obtain additional leverage over Plaintiff Guo.

48.     Defendant Wu continued to threaten that he and his co-conspirators would use state resources to hurt Plaintiff Guo and his family if he did not do their personal bidding to assist their corrupt organization operating outside of the government.  On or around January 10, 2015, Defendant Wu told Plaintiff Guo:

> First, every request raised to you is made on behalf of the Special Investigation Team of Central Discipline Inspection Commission; Second, you have to go on investigating [individual] in America and collect related information.  You should deliver the related materials to me in a secure way as soon as possible; Third, do whatever I ask you to do unconditionally.  That is good for you; Fourth, for the arrest of your family and staff and seizure of assets and accounts by the Special Investigation Team arrested your family and staff, only once you go back to China and cooperate with the investigation, we can sort that out.

49.     Defendant Wu left no doubt what the consequences would be if Plaintiff Guo did not cooperate, telling Guo that: "if you act recklessly abroad, make yourself an enemy of the country, you will be dead.  At the same time, the Special Investigation Team will issue the 'Red Notice' against you and your son."  Defendant Wu further threatened that he and his co-conspirators had "primarily identified [Plaintiff Guo's] ownership of domestic properties and assets."

50.     While Defendant Wu, a private individual, purported to be acting on behalf of the Chinese government, he had no authority to do so.  On information and belief, Defendant Wu is not registered as a foreign agent.  On information and belief, Defendant Wu was working with and on behalf of certain corrupt individuals within the government, including OFFICIAL A and OFFICIAL B, who were acting to protect their personal corrupt enterprise, without authority and contrary to the actual positions of the Chinese government.

51.     Throughout this time, Plaintiff Guo told Defendant Wu that these threats against Plaintiff Guo and his business interests, particularly the arrests of the Plaintiff Companies' employees were damaging Plaintiffs' businesses and relationships with third parties.  Plaintiff Guo also told Defendant Wu that these threats and arrests of his family members were causing him extreme stress and anxiety.

52.     Defendant Wu continued to assure Plaintiff Guo that his family members would be released if Plaintiff Guo cooperated.  For example, Defendant Wu told Plaintiff Guo that the "more cooperative you are with the organization and in the investigation, the better this thing will end up.  You must trust me on this."

53.     The threats and coercion continued throughout January 2015 as Defendant Wu, acting on behalf of his co-conspirators, continued to remind Plaintiff Guo that if he made a

"significant contribution, everything will be forgotten." Defendant Wu demanded that Plaintiff Guo assist with destroying evidence related to the activities of Defendant Wu and his co-conspirators. Defendant Wu also made threats stating "[y]ou must try to achieve this. I'm telling you. Otherwise we can't overcome this obstacle, you know?" We really can't. You can definitely do it. After this, it will be over. Your problems will be solved."

54.     On or around January 21, 2015, Defendant Wu accused Plaintiff Guo of imposing additional conditions in return for Plaintiff Guo continuing to provide assistance. Defendant Wu demanded that Plaintiff Guo do as he was told. He threatened Plaintiff Guo stating that "[y]our true color, brother, your true color will be shown by your action at this time. And that's it. I am not kidding. In another conversation that day, Defendant Wu again reminded Plaintiff Guo that, "after the meeting everything will be OK, including the banks, seized company properties and freedom of your people. Please do seize this chance, and do nothing to complicate matters, do it once and for all."

55.     Throughout 2016 and 2017, Defendant Wu used third-parties to threaten, intimidate and silence Plaintiff Guo. For example, upon information and belief, in September 2017, Defendant Wu offered a senior executive at Plaintiff Guo's security company a multi-million dollar bribe in exchange for his assistance in carrying out Defendant Wu's threats against Plaintiff Guo.

F.   **Defendant Wu and His Co-Conspirators Carry Through on Defendant Wu's Threats by Orchestrating the Seizure of the Plaintiff Companies' Assets Causing Substantial Damages to the Plaintiff Companies and Their Business Interests**

56.     Defendant Wu and his co-conspirators then followed through on his threats regarding Plaintiff Guo's business interests. On or around January 28, 2015, Chinese authorities acting at the direction of Defendant Wu's co-conspirators began seizing the Plaintiff Companies'

13

assets.  Because of their high-ranking positions in the Chinese government, Defendant Wu's co-conspirators had the power to cause government authorities to issue charges, arrest individuals and conduct seizures.  On information and belief, they did so with respect to Plaintiff Guo to further their personal interests and the interests of the corrupt conspiracy.

57.     In particular, these authorities seized and attached the following real estate assets owned by Pangu in or around late January and early February 2015: (1) a hotel; (2) a shopping mall; (3) courtyards; (4) office buildings; and (5) other parts of a building complex where the other Pangu structures are located.  While these assets were initially seized in early 2015, they were subsequently released in or around December 2016 and January 2017.  However, Chinese authorities, again acting at the direction of Defendant Wu's co-conspirators seized the same assets in or around January 2017.

58.     The same authorities, again acting at the direction of Defendant Wu's co-conspirators, also seized assets of Zenith in or around late January and early February 2015.  These assets consist of eight office towers and Zenith's stock holdings.  As with the assets of Pangu, these assets were initially seized in early 2015, but were subsequently released in or around December 2016 and January 2017.  However, Chinese authorities, again acting at the direction of Defendant Wu's co-conspirators seized the same assets in or around January 2017.

59.     In addition to the asset seizures, Defendant Wu and his co-conspirators have caused other harm to Plaintiffs and their business interests.  Specifically, their actions have caused the seizure of the Plaintiff Companies' business and financial files, the suspension of the Plaintiff Companies' new construction projects in China, the cancellation of planned openings of a new shopping mall and movie theater, and layoffs of hundreds of employees due to instability in the businesses.  These actions have substantially limited the ability of the Plaintiff Companies

to conduct business, resulting in lost profits and other business opportunities.  As a result, the Plaintiff Companies have lost substantial value and halted nearly all regular business operations.

60.    The value of the assets seized at the direction of Defendant Wu and his co-conspirators is as follows: (1) Pangu real estate assets: 30.733 billion RMB (approximately $4,822,929,690.00); (2) Zenith real estate assets: 19.077 billion RMB (approximately $2,993,753,610.00); (3) cash held by Pangu, Zenith and their affiliates: 1.073 billion RMB (approximately $168,385,890); and (4) Zenith's stock holdings in Founder Securities Co. Ltd.: 12.921 billion RMB (approximately $2,027,692,530).

61.    In addition to these direct damages caused by the actions of Defendant Wu and his co-conspirators, Plaintiffs have suffered other foreseeable damages, operating losses, penalties and fines, lost profits and business opportunities that will be proven at trial as a result of the above-described conduct.  These losses total approximately 11.2 billion RMB (approximately $1,757,616,000).

## COUNT I

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (Direct and Aiding and Abetting)
### (Plaintiff Companies Only)

62.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

63.    The Plaintiff Companies, which are real estate developers and owners, have business relationships with numerous third parties, including vendors, customers, lenders and other partners.

64.    By the actions described herein, Defendant Wu, in conjunction with his co-conspirators, interfered with these relationships by causing the seizure of the Plaintiff

Companies' assets and interruption of the Plaintiff Companies' current businesses and future business opportunities.

65.     Defendant Wu interfered with the Plaintiff Companies' business relationships through improper means.  In particular, as described herein, Defendant Wu threatened Plaintiff Guo that his business interests would be seized if Plaintiff Guo did not comply with his demands. This coercive behavior amounted to extortion, a crime under New York law, in that Plaintiff Guo felt he had no choice but to comply with the demands.  When he refused, Defendant Wu and his co-conspirators followed through on their threats.  Even after Plaintiff Guo told Defendant Wu that Defendant Wu's actions were having a devastating financial impact on Plaintiff Guo and the Plaintiff Companies, Defendant Wu persisted in his conduct.

66.     As set forth herein, the Plaintiff Companies were damaged by Defendant Wu's intentional interference, including by the seizure of the Plaintiff Companies' assets and through other foreseeable damages, operating losses, penalties and fines, lost profits and business opportunities.

## COUNT II

### AIDING AND ABETTING CONVERSION
### (Plaintiff Companies Only)

67.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

68.     As set forth herein, Defendant Wu, acting with his co-conspirators, interfered with the Plaintiff Companies' property rights in their cash and bank accounts and Zenith's stock holdings by seizing these assets.

69.     Defendant Wu and his co-conspirators intended both to take possession of these assets and to cause the Plaintiff Companies harm by doing so.

16

70.     The Plaintiff Companies are the rightful owners of these assets.

71.     Defendant Wu both directly participated in and directed the above-described actions, and had knowledge that the seizures would take place as demonstrated by his statements and threats to Plaintiff Guo.

72.     Defendant Wu substantially assisted in the conversion of the Plaintiff Companies' assets by the threatening Plaintiff Guo that the assets would be seized if Plaintiff Guo did not comply with the demands of Defendant Wu and his co-conspirators.

73.     As set forth herein, the Plaintiff Companies were damaged by Defendant Wu's conduct, including by the seizure of the Plaintiff Companies' assets and through other foreseeable damages, operating losses, penalties and fines, lost profits and business opportunities.

## COUNT III

### AIDING AND ABETTING TRESPASS
### (Plaintiff Companies Only)

74.      Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

75.     As set forth herein, Defendant Wu and his co-conspirators interfered with the Plaintiff Companies' possession of their real property by seizing numerous holdings of the Plaintiff Companies.

76.     Defendant Wu and his co-conspirators were without justification for their intrusion and seizure.

77.     Defendant Wu both directly participated in and directed the above-described actions, and had knowledge that the seizures would take place as demonstrated by his statements and threats to Plaintiff Guo.

17

78.     Defendant Wu substantially assisted in the trespass on the Plaintiff Companies' real property by the threatening Plaintiff Guo that the assets would be seized if Plaintiff Guo did not comply with the demands of Defendant Wu and his co-conspirators.

79.     As set forth herein, the Plaintiff Companies were damaged by Defendant Wu's conduct, including by the seizure of the Plaintiff Companies' assets and through other foreseeable damages, operating losses, penalties and fines, lost profits and business opportunities.

**COUNT IV**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Plaintiff Guo Only)**

80.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

81.     As set forth herein, Defendant Wu engaged in extreme and outrageous conduct by engaging in a pattern of threats and extortion that culminated in Defendant Wu repeatedly threatening to cause the arrest of Plaintiff Guo's family members and subsequently causing their arrest.  He also repeatedly threatened Plaintiff Guo's personal safety if Plaintiff Guo refused to comply with his demands.  Defendant Wu also caused the seizure of the Company Plaintiffs' business assets, resulting in the near destruction of these businesses.

82.     Through these actions Defendant Wu either intended to cause, or disregarded a substantial probability of causing, severe emotional distress.  In particular, Plaintiff Guo told Defendant Wu that Defendant Wu's extortionate threats were causing him severe distress and Defendant Wu nonetheless persisted with his wrongful conduct.

83.     Defendant Wu's extreme and outrageous conduct caused Plaintiff Guo severe emotional distress.

## COUNT V

### *PRIMA FACIE* TORT
### (Plaintiff Companies Only)

84.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs of the complaint.

85.     As set forth herein, Defendant Wu intended to harm the Plaintiff Companies through his actions by exerting pressure on, and extorting, Plaintiff Guo to comply with his demands.  He took these actions with knowledge that they would cause substantial injury to the Plaintiff Companies.

86.     The above described actions resulted in special damages to the Plaintiff Companies as set forth in paragraphs 60 and 61 herein.

87.     Defendant Wu did not have any excuse or justification for his actions.

### REQUEST FOR RELIEF

Wherefore, Plaintiffs requests the following relief:

A.  That Defendant Wu be held liable for the damages sustained by Plaintiffs as a result of the claims asserted herein and the costs of this suit, including reasonable attorneys' fees; and

B.  Such other relief as the Court deems necessary and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

GUO WENGUI, BEIJING PANGU
INVESTMENT CO. LTD., and BEIJING ZENITH
HOLDINGS CO. LTD.,

By their attorneys,


/s/ Peter A. Sullivan
Peter A. Sullivan, Esq.
Shrutih V. Tewarie, Esq. (*pro hac vice application to be submitted*)
FOLEY HOAG LLP
1540 Broadway, 23rd Floor
New York, NY 10036
psullivan@foleyhoag.com
Telephone: (646) 927-5500
Facsimile: (646) 927-5599


Anthony Mirenda, Esq. (*pro hac vice application to be submitted*)
Michael Licker, Esq. (*pro hac vice application to be submitted*)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000


DATED:  JANUARY 30, 2018